UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA,<br>950 Pennsylvania Avenue, NW<br>Washington, D.C. 20530-0001 | ) ) ) | Civil Action No. |
| | ) ) | **DOCUMENT UNDER SEAL**<br>**(As Required By 31 U.S.C. § 3730(b)(2))** |
| THE DISTRICT OF COLUMBIA,<br>441 4th Street, NW<br>Washington, D.C. 20001 | ) ) ) ) | DO NOT PLACE ON PUBLIC DOCKET<br>DO NOT PLACE IN PRESS BOX |
| EX REL. | ) ) ) | |
| DORTHEA L. CRENSHAW, LICSW,<br>938 East Swann Creek Road, #739<br>Fort Washington, MD 20744 | ) ) ) ) | Jury Trial Demanded |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| CAPITAL COMMUNITY SERVICES LLC,<br>3215 Cathedral Avenue, NW<br>Washington, D.C. 20008 | ) ) ) ) | |
| GEORGE CHOPIVSKY,<br>3215 Cathedral Avenue, NW<br>Washington, D.C. 20008 | ) ) ) ) | |
| CARROLL PARKS,<br>6306 Wood Pointe Drive<br>Glen Dale, MD 20769 | ) ) ) ) | |
| Defendants. | ) ) | |

**COMPLAINT**

# I. NATURE OF THE ACTION

1.     Plaintiff relator Dorthea L. Crenshaw, LICSW ("Relator") brings this qui tam action on behalf of the United States of America under the Federal False Claims Act ("Federal FCA"), 31 U.S.C. §§ 3729 *et seq.,* and the District of Columbia False Claims Law ("DC FCA"), D.C. Code § 2-381.01 *et seq.*, against community-based mental health rehabilitation services ("MHRS") agency Capital Community Services LLC ("CCS"), its principal owner, George Chopivsky, and its President and Chief Executive Officer, Carroll Parks, to recover treble damages and civil penalties for knowingly presenting and causing to be presented false claims for payment to the District of Columbia Medicaid program and the Medicare program.

2.     From two locations in the District of Columbia, CCS provides MHRS to more than 1,500 consumers who suffer from mental health, emotional, and psychiatric disorders. A significant percentage of CCS's consumers live in poverty, and many are homeless. At least 95% of CCS's consumers are Medicaid beneficiaries, and many of CCS's remaining consumers are Medicare beneficiaries.

3.     Since no later than late 2012, CCS has been routinely billing the government health care programs for MHRS that were not provided and for MHRS that were not medically necessary. Relator estimates that 40% of the MHRS for which CCS billed the government health care programs were not properly supported or justified by the corresponding progress note. As a result of its pervasive fraudulent billing, this relatively small community-based agency's reimbursements from the government health care programs exceeded $6 million in 2013.

4.     Chopivsky and Parks knew or recklessly disregarded the fraudulent billing. In fact, Parks constantly undermined Relator's attempts to prevent the fraudulent billing and

ultimately terminated her for refusing to be complicit in the fraud and for reporting it internally and externally to the government.

5.      Relator estimates that because of the fraudulent billing scheme alleged herein, CCS, Chopivsky, and Parks defrauded the United States and the District of Columbia out of millions of dollars.

## II. JURISDICTION AND VENUE

6.      Jurisdiction is founded upon the Federal FCA, 31 U.S.C. §§ 3732(a) & (b), and also 28 U.S.C. §§ 1331 and 1345.

7.      Venue is proper in the District of the District of Columbia under 31 U.S.C. § 3732(a) and sufficient contacts exist for jurisdiction in that many of the acts complained of took place in this District and certain of the defendants are located in the District.

## III. PARTIES

A.      **Plaintiffs**

8.      The United States of America and the District of Columbia are the real parties in interest to the claims of this action.

9.      Plaintiff relator Dorthea L. Crenshaw, LICSW ("Relator") is a United States citizen and a resident of the State of Maryland. Relator is a Licensed Independent Clinical Social Worker who earned a Bachelor's of Arts degree in Social Work from The Catholic University of America and a Master of Social Work degree from Howard University. Relator is also a seminary-trained Licensed Minister. From December 14, 2012 to June 30, 2013, Relator was employed by LLM Placements, which contracted Relator to CCS. CCS assigned Relator to the position of Clinical Manager/Team Leader of one of its Community Support services teams. As a Team   Leader,   Relator   was   responsible   for,   among   other   things,   performing

3

Diagnostic/Assessment services and reviewing and approving treatment plans and progress notes.

**B.     Defendants**

10.     Capital Community Services LLC ("CCS") is a community-based, privately-owned, MHRS agency that has been subcontracted by the District of Columbia Department of Behavioral Health to provide MHRS to adults in the District of Columbia, including Medicaid and Medicare beneficiaries. CCS maintains its principal executive offices at 3215 Cathedral Avenue, NW, Washington, D.C. 20008 and provides MHRS from two locations in the District of Columbia:

- United Medical Center ("UMC")
  1310 Southern Avenue SE
  Washington, D.C. 20032

- The Big Chair
  2041 Martin Luther King Jr. Avenue SE, Suite 236
  Washington, D.C. 20020

CCS's executive offices are located at the Big Chair location.

11.     Defendant George Chopivsky ("Chopivsky") is a resident of the District of Columbia and owns and controls CCS. On information and belief, Chopivsky also owns and controls CCS affiliates United Psychiatric Corporation and Capital Behavioral Health, LLC. Chopivsky has been managing and operating psychiatric hospitals/agencies in different parts of the United States for more than three decades, including, but not limited to, CCS, Hawaii Behavioral Health, River Edge Behavioral Health System (Ohio), and Berks Behavioral Health (Pennsylvania).

12.     Defendant Carroll Parks, BSW, MPA ("Parks") is a resident of the State of Maryland and, since August 2009, has been the President and Chief Executive Officer of CCS. On information and belief, Parks is a partial owner of CCS.

## IV.  LEGAL FRAMEWORK

**A.     The False Claims Acts**

### Federal

13.     The Federal FCA provides, in pertinent part, that any person who:

(A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
* * *

(G)     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government;
* * *

is liable to the United States Government for [statutory damages and such penalties as are allowed by law].

31 U.S.C. § 3729(a)(1).

14.     The Federal FCA defines the terms "knowing" and "knowingly" as follows:

(A)     mean that a person, with respect to information-

(i)     has actual knowledge of the information;

(ii)    acts in deliberate ignorance of the truth or falsity of the information; or

(iii)   acts in reckless disregard of the truth or falsity of the information; and

(B)     require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b)(1).

15.     Section 3729(a)(1) of the Federal FCA provides that a person is liable to the United States for three times the amount of damages that the Government sustains because of the act of that person, plus a civil penalty of $5,000 to $10,000 per violation. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), 64 Fed. Reg. 47099, 47103 (1999), and 28 C.F.R. § 85.3, the FCA civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

### District of Columbia

16.     The DC FCA provides, in pertinent part, that:

(a)     Any person who commits any of the following acts shall be liable to the District for 3 times the amount of damages which the District sustains because of the act of that person. A person who commits any of the following acts shall also be liable to the District for the costs of a civil action brought to recover penalties or damages, and shall be liable to the District for a civil penalty of not less than $5,500, and not more than $11,000, for each false or fraudulent claim for which the person:

(1)     Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2)     Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
* * *

(6)     Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the District, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the District.
* * *

D.C. Code § 2-381.02(a).

17.     The DC FCA defines the terms "knowing" or "knowingly" as follows:

(A)     That a person, with respect to information, does any of the following:

(i)     Has actual knowledge of the information;

> (ii)   Acts in deliberate ignorance of the truth or falsity of the information; or
>
> (iii)  Acts in reckless disregard of the truth or falsity of the information.

(B)   The terms "knowing" and "knowingly" do not require proof of specific intent to defraud.

D.C. Code § 2-381.01(7).

**B.   The Medicaid Program**

18.   Congress established the Medicaid program in 1965 through amendments to the Social Security Act. The Medicaid program aids the District of Columbia and the States in providing medical assistance to eligible needy persons, including indigent and disabled people. Medicaid is the largest source of funding for medical and health-related services for America's poorest people.

19.   Medicaid is a cooperative federal-state public assistance program that is administered by the states. The District of Columbia Department of Health Care Finance administers the District of Columbia Medicaid program ("DC Medicaid"). The U.S. Department of Health and Human Services (HHS) and the Centers for Medicare & Medicaid Services (CMS) administer the Medicaid program for the Federal government.

20.   Funding for Medicaid is shared between the Federal government and the state governments that participate in the program. In 2012 and 2013, the Federal government provided 70% of the funding for DC Medicaid and the District of Columbia provided 30%.

**C.   The Medicare Program**

21.   The United States, through HHS, administers the Supplementary Medical Insurance Program for the Aged and Disabled, established by Part B, Title XVIII, of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.* ("Medicare Program"). Part B of the Medicare Program is a federally subsidized health insurance system for disabled persons or persons who are 65 or

older. Medicare is administered by HHS and CMS. Medicare benefits and non-institutional health care provider reimbursements are paid, in part, from general tax revenue and premiums are paid by program enrollees.

**D.      Mental Health Rehabilitative Services**

22.      Mental health rehabilitative services ("MHRS") are rehabilitative or palliative services administered by the District of Columbia Department of Behavioral Health ("DBH") (formerly known as the Department of Mental Health (DMH)) and rendered by, among others, DBH-certified, community-based MHRS agencies, such as CCS, to eligible consumers requiring such services. (DCMR Rule 22-3402.1). MHRS are intended for the maximum reduction of mental disability and restoration of a consumer to his or her best possible functional level. (DCMR Rule 22-3402.2).

23.      MHRS services are provided by Approving Qualified Practitioners ("AQP"), Qualified Practitioners ("QP"), and Community Support Workers ("CSW"). AQPs include psychiatrists, psychologists, Licensed Independent Clinical Social Workers (LICSW), Advance Practice Registered Nurses (APRN), and Licensed Professional Counselors (LPC). QPs include AQPs as well as Licensed Independent Social Workers (LISW), Registered Nurses (RN), and Addiction Counselors. (DCMR Rule 22-3413.1 & .2). CSWs are credentialed staff who are supervised by QPs.

24.      DC Medicaid covers MHRS when all of the following criteria are met:

(a)      The service is medically necessary;

(b)      The service is delivered by a DBH-certified MHRS provider;

(c)      The service is delivered by QPs and CSWs acting within their scope of practice;

(d)      The service is delivered in accordance with an approved individualized recovery plan ("IRP"); and

8

(e)   The service is delivered in accordance with the service specific standards. (DCMR Rule 22-3402.8).

25.   Medical necessity is a fundamental requirement for Medicaid and Medicare coverage. Medicaid and Medicare do not cover any expenses incurred for services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury ...." 42 U.S.C. § 1395y(a)(1)(A); Medicare Benefit Policy Manual, ch. 16 § 20 (Rev. 1, 10-01-03); DCMR Rule 22-3402.8.

26.   In addition, on information and belief, agencies, such as CCS, submit CMS Form 1500 to Medicaid and Medicare to request reimbursement for MHRS they provide. With each Form 1500 submitted to Medicaid and Medicare, the agency makes the following express certification:

> I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

27.   DC Medicaid reimburses the community-based agencies, such as CCS, for eligible MHRS services on a per unit basis. (DCMR Rule 22-3424.1). Units of service reported for part of an hour must be rounded to the nearest fifteen minute unit. (DCMR Rule 22-3424.3).

28.   Specific types of MHRS include, among other services, Diagnostic/Assessment, Medication/Somatic Treatment, Counseling and Psychotherapy, Community Support, and Assertive Community Treatment.

### Diagnostic/Assessment

29.   A Diagnostic/Assessment is an intensive clinical and functional evaluation of a consumer's mental health condition that be performed for each consumer being considered for

enrollment with an MHRS agency.[1] (DCMR Rule 22-3415.1 & .4). The Diagnostic/Assessment may also include psychological testing. (DCMR Rule 22-3415.6). The Diagnostic/Assessment determines whether the consumer is appropriate for and can benefit from MHRS based upon the consumer's diagnosis, presenting problems, and recovery goals. (DCMR Rule 22-3415.2).

30.     The findings and recommendations for treatment are summarized in a Diagnostic/Assessment report, which is subsequently incorporated into a treatment plan known as an individualized recovery plan ("IRP"). (DCMR Rule 22-3415.8).

**<u>Individualized Recovery Plan</u>**

31.     A complete and current IRP must be maintained for each consumer enrolled with an MHRS agency. (DCMR Rule 22-3408.3). All MHRS, including those that require pre-authorization by DBH, must be addressed in an IRP. (DCMR Rule 22-3408.1).

32.     An IRP must include the following elements:

(a)     A description of the consumer's strengths or assets and challenges and how the consumer's strengths and assets will be utilized in achieving treatment goals.

(b)     A statement of the mutually desired overall long-term results of each intervention, intermediate steps to be taken to achieve those long-term results and the overall treatment being provided for the consumer (Treatment Goals). Treatment Goals must be based on the consumer's expressed needs and needs identified through Diagnostic/Assessment services, and referral information.

(c)     A statement of the specific consumer or family skills that need to be developed or improved. This statement must identify services and resources that need to be changed or modified to achieve each Treatment

---

[1]     Psychiatrists, psychologists, LICSWs, and APRNs can perform both diagnostics and assessments. (DCMR Rule 22-3415.13). RNs, LISWs, LPCs, and Addiction Counselors can perform assessments if supervised by a psychiatrist, psychologist, LICSW, or APRN. (DCMR Rule 22-3415.14). Credentialed CSWs can perform assessments under the supervision of a QP. (DCMR Rule 22-3415.15).

Goal (Objectives). Objectives must be stated in terms of attainable and measurable results.

(d)    A description of the interventions to be used to achieve each Objective and Treatment Goal, including, but not limited to:

    (1)    A staff position or service component responsible for the intervention;

    (2)    The names of other agencies (and other human services systems if applicable) providing services for the consumer, a description of the service being provided, identification by name and title of the staff persons of those agencies or systems of care responsible for providing such services, and evidence of interagency service coordination;

    (3)    The intervention by service type, with the IRP identifying all services related to the provision of mental health services, regardless of the payment source for the service;

    (4)    The frequency and duration of the interventions;

    (5)    For each service, the MHRS provider chosen by the consumer; and

    (6)    A plan for addressing any medical problems that significantly impact or could be expected to affect the consumer's functioning which is to be carried out by either the CSA or another health-providing organization or practitioner.

(e)    Development of psychiatric advance instructions, advance directives, crisis prevention plan, and relapse prevention plan.

(DCMR Rule 22-3408.5).

33.    The AQP as well as the clinical manager (*i.e.*, the QP chosen by the consumer to coordinate the delivery of his or her MHRS) must sign the IRP. (DCMR Rule 22-3408.10). In addition, the clinical manager must document the consumer's participation in the development of the IRP by obtaining the consumer's signature on the IRP. (DCMR Rule 22-3408.8).

34.    The IRP must be reviewed and updated every 180 days and any time there is a significant change in the consumer's condition or situation to reflect progress toward or the lack of progress toward the Treatment Goals. (DCMR Rule 22-3408.14). Each IRP review must include a review of each of the items listed in paragraph 32 above, including progress on Treatment Goals, re-identification of strengths, and progress on Objectives. (DCMR Rule 22-

3408.15). An IRP review also encompasses a review of the medical necessity of the current mental health related medications. At the IRP review, the AQP must identify all required MHRS re-authorizations and establish a target date for requesting the re-authorizations well in advance of their expiration dates.[2] (DCMR Rule 22-3408.18).

35.     The consumer, the consumer's clinical manager, the AQP and other QPs (as necessary or appropriate) must establish new Objectives and modify, add/or delete Treatment Goals based on the results of the IRP review, the consumer's assessment of progress toward meeting Treatment Goals and any new needs, and any other assessments provided by significant others, family or other professionals. (DCMR Rule 22-3408.16).

### Medication/Somatic Treatment

36.     Medication/Somatic Treatment services are medical interventions, including physical examinations; prescription, supervision or administration of mental-health related medications; monitoring and interpreting results of laboratory diagnostic procedures related to mental health-related medications; and medical interventions needed for effective mental health treatment provided as either an individual or group intervention.[3] (DCMR Rule 22-3416.1). Medication/Somatic Treatment services also include monitoring the side effects and interactions of medication and the adverse reactions that a consumer may experience, and providing education and direction for symptom and medication self-management. (DCMR Rule 22-3416.2).

---

[2]   Initial authorizations for new MHRS enrollees and for those enrollees whose Medicaid certification has lapsed are limited to 90 days. (DCMR Rule 22-3404.1).

[3]   Only psychiatrists, APRNs, and RNs may provide Medication/Somatic Treatment. (DCMR Rule 22-3416.10).

37.     Consumers receiving Medication/Somatic Treatment must participate in a psychoeducational session to discuss medication side effects, adverse reactions to medications, and medication self-monitoring and management at the following times:

(a)     During development of the IRP;

(b)     In conjunction with the 180-day IRP review; and

(c)     Any time the consumer's medications are changed.

(DCMR Rule 22-3416.5).

### Counseling & Psychotherapy

38.     Counseling services are individual, group or family face-to-face services for symptom and behavior management, development, restoration or enhancement of adaptive behaviors and skills, and enhancement or maintenance of daily living skills. (DCMR Rule 22-3417.1). Adaptive behaviors and skills and daily living skills include those skills necessary to access community resources and support systems, interpersonal skills, and restoration or enhancement of the family unit and/or support of the family. (DCMR Rule 22-3417.2).

### Community Support

39.     Community Support services are rehabilitation and environmental support that is considered essential to assist the consumer in achieving rehabilitation and recovery goals that focus on building and maintaining a therapeutic relationship with the consumer.[4] (DCMR Rule 22-3418.1). Specific Community Support services include a variety of interventions, such as:

(a)     Participation in the development and implementation of a consumer's IRP;

(b)     Assistance and support for the consumer in stressor situations;

---

[4]     Psychiatrists, psychologists, LICSWs, APRNs, RNs, LPCs, LISWs, and Addiction Counselors may provide Community Support services. (DCMR Rule 22-3418.11). CSWs can provide Community Support services under the supervision of a QP. (DCMR Rule 22-3418.12).

(c)     Mental health education, support and consultation to consumers' families and their support system, which is directed exclusively to the well-being and benefit of the consumer;

(d)     Individual mental health intervention for the development of interpersonal and community coping skills, including adapting to home, school, and work environments;

(e)     Assisting the consumer in symptom self-monitoring and self-management for the identification and minimization of the negative effects of psychiatric symptoms, which interfere with the consumer's daily living, financial management, personal development, or school or work performance;

(f)     Assistance to the consumer in increasing social support skills and networks that ameliorate life stresses resulting from the consumer's mental illness or emotional disturbance and are necessary to enable and maintain the consumer's independent living;

(g)     Developing strategies and supportive mental health intervention for avoiding out-of-home placement for adults, children, and youth and building stronger family support skills and knowledge of the adult, child, or youth's strengths and limitations; and

(h)     Developing mental health relapse prevention strategies and plans.

(DCMR Rule 22-3418.2).

40.     Community Support services can be provided at the MHRS agency, the consumer's home, or another community setting. (DCMR Rule 22-3418.5). There is no annual limit as to the amount of Community Support services a consumer can receive. (DCMR Rule 22-3418.9).

### Assertive Community Treatment

41.     Assertive Community Treatment (ACT) is an intensive, integrated, rehabilitative, crisis, treatment, and mental health rehabilitative community support service provided by an

interdisciplinary team to consumers with serious and persistent mental illness with dedicated

staff time and specific staff to consumer ratios.[5] (DCMR Rule 22-3423.1).

42.    The consumer's ACT team must complete a comprehensive or supplemental

assessment and develop a self-care-oriented IRP. (DCMR Rule 22-3423.3).

43.    Services offered by the ACT team include:

(a)    Mental health-related medication prescription, administration, and
       monitoring;

(b)    Crisis assessment and intervention;

(c)    Symptom assessment, management, and individual supportive therapy;

(d)    Substance abuse treatment for consumers with a co-occurring addictive
       disorder;

(e)    Psychosocial rehabilitation and skill development;

(f)    Interpersonal, social, and interpersonal skill training; and

(g)    Education, support, and consultation to consumers' families and their
       support system which is directed exclusively to the well-being and benefit
       of the consumer.

(DCMR Rule 22-3423.4).

44.    ACT services must include a comprehensive and integrated set of medical and

psychosocial services for the treatment of the consumer's mental health condition that is provided

in a non-office setting. (DCMR Rule 22-3423.5).

45.    The ACT team provides community support services that are interwoven with

treatment and rehabilitative services and regularly scheduled team meetings. ACT team meetings

must be held a minimum of three times a week. (DCMR Rule 22-3423.6).

---

[5]    Psychiatrists, APRNs, RNs and Addiction Counselors can provide ACT services, and CSWs
can provide ACT under the supervision of a QP. (DCMR Rule 22-3423.14 & .15).

### The Clinical Record & Progress Notes

46.     DC Medicaid requires that MHRS agencies maintain a current, clear, organized, and comprehensive clinical record for every individual assessed, treated, or served. (DCMR Rule 22-3410.16). The clinical record must contain information to identify the consumer, support the diagnosis, justify the treatment, document the course and results of treatment, and facilitate continuity of care. At a minimum, the clinical record must include, among other items:

       (a)     Comprehensive diagnostic and psychosocial assessments;

       (b)     The IRP;

       (c)     Detailed description of services provided; and

       (d)     Progress notes.

(DCMR Rule 22-3410.16).

47.     DBH also has specific requirements regarding the content of progress notes:

       (a)     They must be written at least once per month and as needed;

       (b)     Reflect IRP implementation, including documentation of the choices and perceptions of the consumer regarding the service(s) provided;

       (c)     Describe the progress the consumer has made towards his/her IRP goals; and

       (d)     Be signed and dated by the CSW or the QP making the entry. A QP must countersign progress notes made by the CSW.

(DCMR Rule 22-3410.17).

48.     Each MHRS agency must develop and maintain sufficient written clinical documentation to support each therapy, service, activity, or session for which DC Medicaid is billed which, at a minimum, consists of:

       (a)     The specific service type rendered;

       (b)     The date, duration, and actual time, a.m. or p.m. (beginning and ending), during which the services were rendered;

(c)     Name, title, and credentials of the person providing the services;

(d)     The setting in which the services were rendered;

(e)     Confirmation that the services delivered are contained in the consumer's IRP;

(f)     A description of each encounter or service by a QP or credentialed staff with the consumer which is sufficient to document that the service was provided; and

(g)     Dated and authenticated entries, with their authors identified, which are legible and concise, including the printed name and the signature of the person rendering the service, diagnosis and clinical impression recorded in the terminology of the ICD-9 CM, and the service provided.

(DCMR Rule 22-3410.18).

## V.  FACTUAL ALLEGATIONS

**A.     Capital Community Services**

49.     Defendant Chopivsky started CCS in 2009. He hand-picked defendant Parks, who previously held a senior position at DBH, to be CCS's President and Chief Executive Officer. Chopivsky also personally selected Brian Fallon to serve as CCS's Chief Operating Officer.

50.     In addition to Parks, CCS employed other former DBH officials, including Pamela Davis (Clinical Director), Angela Milligan (Corporate Compliance Officer), and Rita Collins (Clinical Manager/Team Leader/Nurse). The salaries CCS paid these individuals were significantly higher than the amounts other community-based agencies were paying at the time.

51.     From its two locations in the District of Columbia, CCS offers the following types of MHRS to more than 1,500 consumers:

- Diagnostic/Assessment;
- Medication/Somatic Treatment (individual and group);
- Counseling and Psychotherapy (individual and group);
- Community Support (individual and group); and
- Assertive Community Treatment.

52.     At least 95% of CCS's consumers are beneficiaries of DC Medicaid. Many of CCS's remaining consumers are Medicare beneficiaries. CCS's consumers suffer from mental health, emotional, and psychiatric disorders. A significant percentage of its consumers live in poverty, and many are homeless.

53.     Throughout Relator's tenure there, CCS employed approximately five psychiatrists, one psychologist, six social workers, and two nurses to provide MHRS to its consumers.

54.     There were also two Community Support teams, each consisting of approximately 15 CSWs. One of the Community Support teams was based at the Big Chair location, and the other team was located at the UMC location. Relator was the Clinical Manager/Team Leader of the Community Support team based at UMC.[6]

55.     CCS also had two ACT teams – ACT I and ACT II – both of which were based at UMC. Relator also reviewed progress notes for ACT I.

56.     The typical treatment workflow at CCS can be summarized as follows:

(a)     The consumer received a Diagnostic/Assessment – Team Leaders who were AQPs typically performed the Diagnostic, and QPs and CSWs performed the Assessment;

(b)     Medical Director/psychiatrist Dr. Ryszard Zebrak examined the consumer to confirm or adjust the diagnosis;

(c)     Using the Diagnostic/Assessment report, a CSW created an IRP setting forth how often each consumer would receive treatment;

_____

[6]   Relator was the sixth person in a three-year period to serve as the Team Leader of this team.

(d)    The Team Leader then reviewed the IRP and either approved or modified it;

(e)    The IRP was forwarded to CCS's billing department, which then submitted it to DC Medicaid and, if necessary, included a request for preauthorization;

(f)    A CSW implemented the IRP and administered the prescribed MHRS to the consumer;

(g)    CSWs were required to prepare a progress note detailing each service they rendered — though CSWs were supposed to enter progress notes within 48 hours after providing the reported service, many CSWs waited until the last minute (*i.e.*, Wednesday afternoons of the following week) to enter their progress notes;

(h)    Each Monday, the CSWs submitted billing reports, or "invoices," (in paper form) to their Team Leader itemizing the services they provided during the prior week as well as the time spent providing each reported service;

(i)    Every other Friday, CCS paid the CSWs for the services that they provided during the prior two weeks – since CSWs were compensated based solely upon the services they provided, they had a financial incentive to provide/bill as many hours as possible; and

(j)    Each week CCS submitted a claim to the government health care programs for payment for MHRS for which there was an approved progress note.

57.    CCS utilized an electronic medical record, communication, and billing system from Credible Wireless, Inc. ("Credible"). The assessments, psychiatric reviews, IRPs, and progress notes were entered into Credible. Additionally, CCS used Credible to bill the government health care programs for MHRS. The system also issued alerts letting CCS know

when an IRP expired and when a new one was required, and it tracked any changes that were made to progress notes. Parks and Fallon, who were both very hands-on and oversaw CCS's daily operations, regularly monitored workers' use of Credible.

**B.    CCS Routinely Billed The Government Health Care Programs For Services That Were Not Provided And For Services That Were Not Medically Necessary**

58.    Throughout the entire period that Relator worked there, CCS routinely billed the government health care programs for services that were not provided and for services that were not medically necessary. Relator estimates that 40% of the services for which CCS billed Medicaid and Medicare were not properly supported or justified by the corresponding progress note.

59.    Relator estimates that because of the fraudulent billing scheme alleged herein, CCS, Chopivsky, and Parks defrauded the United States and the District of Columbia out of millions of dollars. By pumping up its revenues through fraudulent billing, this relatively small community-based agency received over $6 million in reimbursements from the government health care programs in 2013. Based on the number of counselors that worked at CCS and the number of consumers it treats, it would have been clear to anyone who viewed CCS's financial results that a significant portion of the $6 million in annual revenues must have been the result of fraud.

60.    Multiple forms of fraudulent billing occurred at CCS:

(a)    CSWs reported providing two hours of services when in fact they did not treat the consumer at all;

(b)    CSWs reported providing two hours of services when in fact they actually treated the consumer for substantially less time;

(c)     CSWs provided treatment to consumers that was not medically necessary; and

(d)     CSWs provided treatment to consumers who did not have an IRP or whose IRP had expired.

61.     In fact, on Relator's second day at CCS during orientation, Corporate Compliance Officer ("CCO") Angela Milligan warned Relator that some CSWs were submitting billing without seeing the consumers.

62.     In order to get paid for the fraudulent time or medically unnecessary services that they reported, CSWs entered false progress notes into Credible, which then had to be approved by a Team Leader.

63.     As a Team Leader, one of Relator's chief responsibilities was to review and approve CSWs' progress notes. After routinely seeing progress notes that, for the reasons listed below, did not support the services that the CSWs were claiming to have provided, CCS's pervasive fraudulent billing scheme became apparent to Relator:

(a)     The description of the service in the progress note was inconsistent with the service that the CSWs claimed to have provided;

(b)     The description of the service in the progress note was inconsistent with the amount of time that the CSWs claimed to spend treating the consumer;

(c)     CSWs were billing mainly in two-hour increments;

(d)     CSWs used the same description of the service provided in every progress note;

(e)     The progress note reported an intervention that was not medically necessary; and/or

(f)     The service and/or time reported in the progress note did not align with the consumers' IRPs.

64.     With regard to medical necessity, many CSWs submitted billing reports and progress notes for merely talking to or acting like a friend to a consumer. These are not covered services. In addition, many of the consumers suffered from a chronic mental illness, such as schizophrenia, that prevented them from deriving any benefit from more than one hour of treatment from a CSW, who are not trained clinicians. Two hours of treatment would only be medically necessary where a CSW was required to perform a specific task, such as treating a consumer who is in crisis or assisting a consumer with an approved task (*i.e.*, assisting an illiterate consumer with an application for housing). In many cases, CSWs also improperly inflated their treatment times by including travel time and/or the time they spent writing progress notes.

65.     In January 2013, Relator attended a discharge planning meeting at DBH at which she consulted with a team leader from another agency regarding the appropriateness of CSWs billing in two-hour increments. The colleague agreed that two-hour billing was inappropriate.

66.     After the meeting, Relator notified her team members as well as Parks and then Clinical Director, Pamela Davis, that billing in two-hour increments was inappropriate and that if it continued she would be forced to report the practice to the Office of Accountability at DBH. Davis instructed Relator to report any CSWs who continued to bill in two-hour increments. Parks, however, subsequently sent Relator a message through Credible instructing her to not write-up the workers. He also stated that two-, three-, four- and five-hour notes were not necessarily inappropriate.

67.     On January 27, 2013, Relator sent a message to Parks and other CCS officers expressing her concern that she was being instructed to sign notes in which the length of service was inflated. Relator also raised concerns about the work that was being billed by a CSW on her team. Relator was concerned that the CSW's billing reports did not accurately reflect the services he had provided to the consumers.

68.     On February 6, 2013, Relator requested that the Clinical Director review approximately 20 notes that had been submitted by a CSW under Relator's supervision whose consumers were predominantly prison inmates because approximately half the notes contained the same description regarding the service provided – essentially that the consumers were illiterate and that she was assisting them in applying for Social Security benefits. The large volume of notes bearing the same service description, coupled with the fact that persons serving criminal punishments in prison are ineligible to receive Social Security benefits, caused Relator to become suspicious that the notes were fraudulent. The Clinical Director took weeks to respond and then said she read the progress notes and they looked fine.

69.     Relator also learned from the biller onsite at UMC that this same CSW had been regularly submitting IRPs directly to billing that did not have the consumers' signature, which is required under DCMR Rule 22-3408.8. One such unsigned IRP was submitted in January or early February for consumer CL. The CSW submitted the unsigned IRPs directly to the biller at UMC because she knew Relator would not approve them since they did not have the consumers' signature on them. Despite Relator's multiple complaints to CCS's Clinical Director and Parks about this CSW's improper practices, the CSW was merely transferred to the other team where she was allowed to continue providing services.

70.     Thereafter, on February 14, 2013, Relator requested that the CCO open an investigation of four CSWs under her supervision to determine whether their consumers were actually receiving the services for which the CSWs were billing. The CCO's investigation revealed that many of the billing reports and progress notes entered by these CSWs were fraudulent.[7]

71.     After learning the results of the CCO's investigation, Relator informed Parks, Fallon, and Davis that, unless CCS terminated the CSWs, she would report the inappropriate billing to DBH. Two of the workers were subsequently terminated, but CCS permitted two of the CSWs to continue working at the agency. Relator informed CCS that she was unwilling to continue approving the work submitted by these two CSWs.

72.     On April 22, 2013, Relator informed Parks and other CCS officers that one of these CSWs was continuing to bill for services that were not medically necessary.

73.     Some additional examples of fraudulent billing that Relator witnessed include:

(a)     A CSW submitted notes for two-hour visits, but the description of the treatment rendered did not support a two-hour visit, and the description on all of the CSW's notes were the same, indicating that she was not really providing the treatment.

(b)     Another CSW, who was enrolled in school, routinely claimed to provide nearly 60 hours of Community Support services each week, all in two-hour increments and starting as early as 6:45 a.m. each morning.

(c)     Another CSW submitted a progress note stating that she provided three hours of Community Support services for teaching a consumer to wash dishes and mop the floor.

---

[7]     Relator requested a copy of the CCO's report, but the CCO told Relator that Parks prohibited her from sharing the report with anyone other than him.

(d)     This same CSW submitted another progress note claiming to have prepared an IRP that was clearly false -- the note, which had been entered into Credible at 1:49 p.m. on March 8, 2013, stated that the CSW had met with the consumer at CCS's office from 1:35 to 3:35 p.m. that same day. Yet, after reading the progress note that day at 2:48 p.m., Relator checked to see if the consumer was present but found that no one was there.

(e)     Several workers routinely submitted their progress notes immediately prior to the billing deadline so that Relator would have less time to review the notes.

(f)     On Relator's second day at CCS, a provider from Care Co., which provides housing to certain CCS consumers, called to report that one of the CSWs who Relator would be supervising, was billing for services that were not being provided to a consumer staying at the Care Co. facility.

74.     Of the 15 CSWs on Relator's team, less than half consistently submitted progress notes that supported the treatment and times they were reporting.

75.     Relator regularly discussed with other Team Leaders the fraudulent billing they were witnessing at CCS. Like the CSWs on Relator's team, the CSWs on the other teams were also billing for services that they were not providing and for services that were not medically necessary.

76.     Additionally, the Team Leader for ACT I explained that one of the members of that team, who must find and then treat consumers in a community setting, attempted to bill 90 minutes for searching for consumers. In view of HIPAA privacy restrictions, it would be difficult for a counselor to be able to spend 90 minutes searching for a consumer they had never seen.

77.     The Team Leader for the Community Support team based at Big Chair, informed Relator and other Team Leaders during a meeting held on May 29, 2013 that her entire team of

CSWs reported having provided two hours of treatment in their progress notes and, since Parks said it was okay to bill in two-hour increments, she approved all of the notes. Although their case loads were similar, Parks allowed the Team Leader who approved all progress notes to work nine hours each day, while limiting the pay for the Relator and at least one of her other colleagues to eight hours per day.

78.    Relator also regularly discussed the fraudulent practices with a CSW, who explained how several CSWs acknowledged to her that they were engaging in fraudulent billing.

79.    Though Relator and other Team Leaders rejected a significant amount of fraudulent progress notes and time reported therein, the fraudulent billing was so pervasive, and the time that they had to review the progress notes was so short, the Team Leaders were only able to prevent a small percentage of the fraudulent billings from getting submitted to the government health care programs.

80.    Relator and other Team Leaders frequently lacked sufficient time to properly review all of the progress notes because they were received shortly before CCS was to seek payment for the services. CCS required that, by noon each Thursday, Team Leaders review and approve all progress notes related to services provided during the week before. Because a large number of CSWs typically waited until Wednesday to enter progress notes, the Team Leaders often had to work through the night reviewing the progress notes to meet the weekly Thursday deadline. This left Team Leaders insufficient time to properly review the notes. Relator informed CCS's officers that there were several CSWs who were waiting until close to the deadline to submit their progress notes. Despite being fully aware of this situation Parks and Fallon, nevertheless, allowed CSWs to turn in notes at the last minute.

81.    In fact, Parks threatened to withhold the Relator's paycheck if she did not approve the progress notes by the weekly Thursday deadline. The first threat occurred just three weeks after Relator started working at CCS.

82.    Similarly, the Team Leaders received weekly communications instructing them of the need to "get more revenue approved."

83.    The poor quality of the progress notes also made it impossible for CCS Team Leaders to properly review the progress notes in such a short amount of time. Most of the CSWs on Relator's team had little or no clinical experience and therefore also lacked sufficient experience at writing progress notes that complied with DC Medicaid requirements. Relator requested that CCS provide additional computer training for the CSWs under her supervision, but the CCO refused, saying that the CSWs did not need it.

84.    Credible contains a function that allows Team Leaders to "unapprove" a progress note that they had inadvertently approved. CCS never provided this function on Relator's Credible desktop. Indeed, Relator was the only Team Leader who did not have the "unapprove" feature. As a result, Relator would send Fallon messages within Credible instructing him which notes should be unapproved. Though Fallon would promptly acknowledge other messages Relator sent, he never acknowledged Relator's messages requesting that he "unapprove" progress notes.

85.    CCS also engaged in several other illegal practices to defraud the government health care programs:

(a)    CCS submitted claims for payment to the government health care programs for Community Support services reported by CSWs even though the progress notes were not approved.

27

(b)     According to another Team Leader, CCS double-billed 15-minute visits as 30-minute visits.

(c)     On several occasions, a psychologist falsely reported providing counseling and psychotherapy services to consumers at UMC at times when two of the CSWs on Relator's team were seeing the consumers.

(d)     CCS billed DC Medicaid for services more than one year after they were provided. Under DCMR Rule 22-3410.34, DBH is prohibited from paying a claim that is submitted more than one year from the date of service, unless Federal law or regulations would require such payment to be made. CCS had accumulated over $100,000 in unbilled time. Parks and Fallon insisted that CCS bill the government health care programs for the unbilled services. They did not want to lose this revenue because CCS had already paid the CSWs for the underlying services. Parks directed the then Clinical Director to sign progress notes so that CCS could bill Medicaid for thousands of dollars' worth of services from at least a full year earlier.

(e)     Despite receiving funding from DBH to treat uninsured consumers, Parks instructed CCS staff to not treat consumers who did not have insurance, including consumers at St. Elizabeth's Hospital.

(f)     CSWs also frequently billed for providing MHRS to consumers who did not have an IRP. This occurred even though Credible clearly identified when a consumer did not have an IRP. Although the consumers did not have an IRP, CCS often went ahead and billed the government health care programs for the services anyway.

(g)     Similarly, CCS frequently failed to review and update consumers' IRPs.[8]
Yet again, CCS nevertheless continued providing the MHRS services and billing the government
health care programs for the services. Inasmuch as Credible issued an alert when an IRP expired,
CCS knew precisely when a consumer needed to have their IRP reviewed and updated. In
addition, as part of the IRP review and update process, Medical Director/psychiatrist Dr. Ryszard
Zebrak was supposed to perform another psychiatric evaluation and reassess whether the
consumer was taking the correct medicines and proper dosages. Like the IRP, the psychiatric
evaluations frequently were not updated.[9] As a result of outdated IRPs, many consumers
received unnecessary or inappropriate MHRS.  In addition, CCS's failure to perform timely IRP
reviews placed many of these vulnerable consumers at risk of taking the wrong psychiatric
medication or the incorrect dosage of a proper medication. Knowing that IRPs were not being
reviewed on a timely basis or at all, CCS tried to insulate itself from liability by requiring CSWs
to sign an agreement stating that they would not provide a service unless a consumer's IRP was
less than 180 days old. This agreement, however, was merely a façade because CSWs continued
providing services to consumers whose IRPs were expired, and CCS continued to bill for such
services.

---

[8]   As explained in paragraph 34 above, CCS is required to review and update a consumer's IRP
every 180 days and any time there is a significant change in the consumer's condition or
situation to reflect progress toward or the lack of progress toward the treatment goals. (DCMR
Rule 22-3408.14). The consumer, the consumer's clinical manager, AQP and other QPs as
necessary or appropriate must establish new objectives and modify, add/or delete treatment goals
based on the results of the IRP review, the consumer's assessment of progress toward meeting
treatment goals and any new needs, and any other assessments provided by significant others,
family or other professionals. (DCMR Rule 22-3408.16).

[9]   Dr. Zebrak was also known to commonly prescribe drugs that were not indicated and to
prescribe stronger than appropriate dosages of psychiatric medications, often causing the
consumers to become incoherent. Many consumers did not want to be treated by Zebrak because
of his erroneous prescriptions.

**C.    Parks And Fallon Allowed The Fraudulent Billing To Occur**

86.    Under DCMR Rules 3410.37 and 3410.38, CCS was obligated to ensure compliance with Federal and District of Columbia laws and regulations and to promptly report the fraudulent conduct occurring within the company to DBH. CCS did neither.

87.    Parks and Fallon were not only aware that CSWs were fraudulently reporting having provided services that were not performed and that were medically unnecessary, they allowed it to continue.

88.    The two most senior CCS officers did not want the Team Leaders to reduce CSWs' inflated time or reject their progress notes because the fraudulent billing enabled CCS to obtain significantly more reimbursement revenue from the government health care programs. Moreover, since CCS had already paid the CSWs based on the times stated in their billing reports, when Team Leaders reduced, or "cut," the inflated length of the service stated in the CSWs' progress notes, CCS lost money – *i.e.*, it paid the CSWs for services that it could not bill to the government. As a result, CCS put significant pressure on Team Leaders to approve all progress notes and to not cut CSWs' reported time.

89.    As alleged above, Relator and the other Team Leaders reported their concerns about CSWs' fraudulent billing practices to Parks. For example, in January 2013, Relator sent an email to Parks and the then Clinical Director, Pamela Davis, notifying them that her team's progress notes did not support two-hour sessions:

> I also have a tremendous sense of urgency about the fact that most staff have billed for 2-hour increments. I will be speaking with them in staff meeting on Wednesday about the importance of documentation fully supporting what they are billing for. Frankly, I do not believe that many of the notes that I saw do support the billing.

90.    Relator also reported to Parks, Fallon and Davis that CSWs were fraudulently reporting providing services that were not in fact being provided. For example, on March 22, 2013, Relator informed the CCS officers that she refused to approve progress notes entered by several CSWs.

91.    In addition, the CCO provided Parks all of the reports that she prepared detailing the CSWs' fraudulent billing practices. The CCO also requested to meet with Parks to discuss the reports. Since Parks refused to meet with the CCO and took no action in response to the reports, the CCO persisted in repeatedly re-sending the investigative reports to Parks. But this too failed to elicit a response. Parks eventually fired the CCO.

92.    Notably, on April 3, 2013, Relator sent an email to Davis, on which the CCO, Parks, and Fallon were copied, proposing that CCS change its note policy from having CSWs submit a progress note for each encounter to requiring them to submit a monthly progress note in order improve the quality of services provided, improve the quality of the notes, and to satisfy DBH's requirements. In this same email Relator also proposed that Team Leaders meet with each CSW on a weekly basis to review their caseload and to ensure they are seeing all of their consumers regularly. In commenting on Relator's proposals, the CCO sent an email on April 3, 2013 to Davis, on which Parks, Fallon, Relator and others were copied, stating:

> Ms. Davis when Ms. Crenshaw and I discussed this weekly supervision was included which would be a must and allow Team Leaders to go over every CSW's caseload. Also, **this will cut down on fraud** and make for a strong monthly note. [Emphasis added.]

93.    Parks also knew that there were CSWs who waited until Wednesdays to enter their progress notes into Credible and that as a result Team Leaders lacked sufficient time to properly review all of the progress notes prior to the Thursday noontime deadline. For example, Parks sent Relator and two other Team Leaders an email in December 2012 threatening that their

31

pay would be reduced if they failed to approve all of the CSWs' progress notes before the Thursday deadline.

94.     Parks sent Relator a message within Credible admonishing her for changing a two-hour note to properly reflect that only one hour of service had been provided. Similarly, after learning that Relator warned CSWs on her team that they would be reported to DBH if they continued engaging in fraudulent billing, Parks sent Relator a message within Credible demanding that she hold-off on taking any action.

95.     On May 29, 2013, Clinical Director Edith Amobi asked Relator to approve progress notes from two CSW's who had previously submitted fraudulent billing. While Parks was present, Relator refused Amobi's request, explaining that she did not feel comfortable doing so because their progress notes appeared fraudulent. Amobi told Relator, "No one goes to jail for Medicaid fraud, unless the company cannot return the money." Further demonstrating her complete disregard for the law, in late June 2013, Amobi explicitly instructed CSWs to report in two-hour increments regardless of the amount of time they spent with the consumers.

96.     Subsequent to the aforementioned incidents, Relator reported CCS to the District of Columbia Office of the Inspector General (OIG). On June 13, 2013, Relator met with two Investigators from the OIG and informed them of the inappropriateness of the billing that was taking place at CCS. Relator informed CCS's officers and the CSW's under her supervision that she reported the fraudulent billing practices to the OIG.

97.     Afraid that he would report the fraud, Parks and Fallon prohibited CCS's CFO, from even viewing CCS's financials. When the CFO said he needed to reconcile the company's books, Fallon provided the CFO with a sheet of paper stating that the books had been

"reconciled." In fact, Parks and Fallon would not even authorize the CFO to write a check.[10] By not having a true CFO, CCS violated DBH's requirement that all community-based agencies employ a designated individual who is responsible for executing or overseeing the financial operations of the agency. (*See* DCMR Rule 22-3411.8).

**D.      CCS Retaliated Against Relator And Others Who Reported The Illegal Practices Occurring At The Mental Health Rehabilitation Agency**

98.      On June 21, 2013, Parks, acting on behalf of CCS, withheld part of Relator's pay while she was at her sister's funeral, despite the fact that she had missed her sister's wake the day before to complete all of her work.

99.      On June 30, 2013, CCS then terminated Relator in retaliation for making numerous internal complaints as well as external complaints to the District of Columbia and Federal government about the illegal conduct taking place within CCS.

100.      For example, Relator reported to the District of Columbia Health Professional Licensing Administration in May 2013 that Clinical Director Edith Amobi was falsely claiming to be a Licensed Independent Clinical Social Worker (LICSW) when she was merely a Licensed Professional Counselor.[11] In or around early June 2013, Relator reported the fraudulent billing practices alleged herein to the District of Columbia OIG. And, right before she was terminated, Relator informed Parks that she would be reporting CCS to the Federal Equal Employment Opportunity Commission.

---

[10]   All paychecks were signed by Parks.

[11]   Both internally at CCS and publicly, Amobi claimed to be a LICSW when in fact she was merely a Licensed Professional Counselor. Since she was not a LICSW, Amobi was not permitted to diagnose consumers' mental health problems. Amobi nevertheless diagnosed consumer KH with mood disorder in a Diagnostic/Assessment report dated May 31, 2013.

101.    Relator was not the only employee that CCS retaliated against for trying to stop the fraudulent practices that had engulfed the company:

(a)    Parks and Fallon terminated CFO Russell Mann in April 2013 after Mann asked what CCS was doing about all of the workers who were put under investigation and found to be engaging in fraud.

(b)    Parks and Fallon terminated CCO Angela Milligan in August 2013 because she persistently re-sent her investigative reports detailing the fraudulent billing practices to Parks trying to get him to take action to stop the fraud.

(c)    In October 2013, Parks and Fallon terminated another Team Leader who frequently complained of the fraudulent billing.

**E.    Chopivsky Was Likewise Aware Of Or Recklessly Disregarded The Existence Of The Fraud And Did Nothing To Stop It**

102.    Chopivsky either knew, recklessly disregarded, or deliberately ignored the fraud alleged herein.

103.    Chopivsky demanded that Parks and Fallon keep him closely informed of CCS's operations. Consequently, Parks and especially Fallon were in constant contact with Chopivsky, updating him on what was happening at CCS.

104.    After he was terminated in April 2013, CFO Russell Mann called Chopivsky and alerted him that Parks and Fallon were causing the problems at CCS.

105.    After being fired by Parks in August 2013, CCO Angela Milligan likewise informed Chopivsky that Parks and Fallon were causing the problems at CCS.

106.    On information and belief, as of the date of this Complaint, Parks remains CCS's President and CEO.

107.   As a hands-on owner of CCS and as a businessman who had prior and ongoing experience operating similar mental health rehabilitation agencies, Chopivsky was no doubt aware that based on the number of workers and consumers it had, CCS could not legitimately earn the amount of revenue that the company was generating annually. Chopivsky would also have certainly been aware that CCS was paying salaries to its officers that were considerably higher than what other mental health agencies in the District of Columbia paid to their officers.

108.   Once Chopivsky became aware of the fraud, he had an affirmative duty to report it and refund all amounts CCS received from DC Medicaid and Medicare as a result of the fraud. He did not do so.

## VI. COUNTS

### COUNT I
### FEDERAL FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. §§ 3729(a)(1)(A), (B) & (G)

109.   Relator hereby incorporates and re-alleges paragraphs 1 through 108 as though fully set forth herein.

110.   CCS, by and through its agents, officers, and employees, together with Chopivsky and Parks violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented to DC Medicaid and Medicare false or fraudulent claims for reimbursement of services provided to, or purported to be provided to, Medicaid and Medicare beneficiaries that were not performed, were not medically necessary, and/or were not provided in conformity with DC Medicaid's and Medicare's requirements. Accordingly, CCS, Chopivsky, and Parks also caused DC Medicaid to present false submissions to the United States for reimbursement of Medicaid expenditures in violation of 31 U.S.C. § 3729(a)(1)(A).

111.    CCS, by and through its agents, officers, and employees, together with Chopivsky and Parks also violated 31 U.S.C. § 3729(a)(1)(A) because through these acts they knowingly presented or caused to be presented false and fraudulent claims to DC Medicaid, which, under 31 U.S.C. § 3729(b)(2)(A), is a grantee and/or recipient of United States funds, for reimbursement of services provided to, or purported to be provided to, Medicaid beneficiaries that were not performed, were not medically necessary, and/or were not provided in conformity with DC Medicaid's requirements.

112.    CCS, by and through its agents, officers, and employees, together with Chopivsky and Parks, in violation of 31 U.S.C. § 3729(a)(1)(B), also knowingly made, used, or caused to be made or used, false records or statements material to claims for reimbursement paid by DC Medicaid and Medicare for services provided to, or purported to be provided to, Medicaid and Medicare beneficiaries that were not performed, were not medically necessary, and/or were not provided in conformity with DC Medicaid's and Medicare's requirements. These false records and statements included, among others, false and misleading progress notes, IRPs, and requests for payment (Form 1500) and the certifications contained therein. Accordingly, CCS, Chopivsky, and Parks also caused the DC Medicaid program to provide false records and statements to the United States that were material to false requests for reimbursement of Medicaid expenditures in violation of 31 U.S.C. § 3729(a)(1)(B).

113.    CCS, by and through its agents, officers, and employees, together with Chopivsky and Parks, in violation of 31 U.S.C. § 3729(a)(1)(G), knowingly made, used, or caused to be made or used, false records or statements material to obligations to pay money to DC Medicaid and Medicare and knowingly concealed obligations to pay money to DC Medicaid and Medicare. In addition, CCS, by and through its agents, officers, and employees, together with Chopivsky

and Parks, failed to report the alleged fraudulent conduct and to refund DC Medicaid and Medicare for services provided to, or purported to be provided to, Medicaid and Medicare beneficiaries that were not performed, were not medically necessary, and/or were not provided in conformity with DC Medicaid's and Medicare's requirements.

114.    In engaging in the conduct alleged above, CCS, Chopivsky, and Parks acted "knowingly" as that term is defined in 31 U.S.C. § 3729, in that they acted with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information.

115.    As a result of CCS's, Chopivsky's, and Parks's violations of 31 U.S.C. §§ 3729(a)(1)(A), (B), and (G) the United States has suffered damages in an amount to be determined at trial.

**COUNT II**
**DISTRICT OF COLUMBIA FALSE CLAIMS LAW VIOLATIONS**
**D.C. Code §§ 2-381.02(a)(1), (2) & (6)**

116.    Relator hereby incorporates and re-alleges paragraphs 1 through 108 as though fully set forth herein.

117.    CCS, by and through its agents, officers, and employees, together with Chopivsky and Parks violated D.C. Code § 2-381.02(a)(1) by knowingly presenting, or causing to be presented to DC Medicaid false or fraudulent claims for reimbursement of services provided to, or purported to be provided to, Medicaid beneficiaries that were not performed, were not medically necessary, and/or were not provided in conformity with DC Medicaid's requirements.

118.    CCS, by and through its agents, officers, and employees, together with Chopivsky and Parks, in violation of D.C. Code § 2-381.02(a)(2), also knowingly made, used, or caused to be made or used, false records or statements material to claims for reimbursement paid by DC Medicaid for services provided to, or purported to be provided to, Medicaid beneficiaries that

were not performed, were not medically necessary, and/or were not provided in conformity with DC Medicaid's requirements. These false records and statements included false and misleading progress notes, IRPs, and requests for payment (Form 1500) and the certifications contained therein.

119. CCS, by and through its agents, officers, and employees, together with Chopivsky and Parks, in violation of D.C. Code § 2-381.02(a)(6), knowingly made, used, or caused to be made or used, false records or statements material to obligations to pay money to the District of Columbia and knowingly concealed obligations to pay money to the District of Columbia. In addition, CCS, by and through its agents, officers, and employees, together with Chopivsky and Parks, failed to report the fraudulent conduct alleged herein and to refund DC Medicaid for services provided to, or purported to be provided to, Medicaid beneficiaries that were not performed, were not medically necessary, and/or were not provided in conformity with DC Medicaid's requirements.

120. In engaging in the conduct alleged above, CCS, Chopivsky, and Parks acted "knowingly" as that term is defined in D.C. Code § 2-381.01(7), in that they acted with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information.

121. As a result of CCS's, Chopivsky's, and Parks's violations of D.C. Code §§ 2-381.02(a)(1), (2) and (6), the District of Columbia has suffered damages in an amount to be determined at trial.

## VII. PRAYER FOR RELIEF

122. WHEREFORE, Relator, on behalf of the United States and the District of Columbia, demands that judgment be entered in her favor and against CCS, Chopivsky, and Parks for the maximum amount of damages and such other relief as the Court may deem

appropriate on each Count. This includes, with respect to the Federal FCA, three times the amount of damages to the United States plus civil penalties of no more than eleven thousand dollars ($11,000) and no less than five thousand five hundred dollars ($5,500) for each false claim and any other recoveries or relief provided for under the Federal FCA. This Request also includes, with respect to the DC FCA, three times the amount of damages sustained by the District of Columbia plus civil penalties of no more than eleven thousand dollars ($11,000) and no less than five thousand five hundred dollars ($5,500) for each false claim, and any other recoveries or relief provided for under the DC FCA.

123.    Further, Relator requests that she receive the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States and the District of Columbia, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relator requests that her award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities who are not parties to this action.

## VIII. DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

DATED: April 25, 2014                 Respectfully submitted,

                                      David E. Haynes (D.C. Bar No. 483119)
                                      THE COCHRAN FIRM
                                      1100 New York Ave., NW, Suite 340 West
                                      Washington, D.C. 20005
                                      Tel: 202-682-5800
                                      dhaynes@cochranfirm.com

                                      Jeanne A. Markey
                                      Gary L. Azorsky
                                      Casey M. Preston
                                      COHEN MILSTEIN SELLERS & TOLL, PLLC
                                      1717 Arch Street, Suite 3610
                                      Philadelphia, PA 19103
                                      Tel: 267-479-5700
                                      jmarkey@cohenmilstein.com
                                      gazorsky@cohenmilstein.com
                                      cpreston@cohenmilstein.com

                                      *Counsel for Relator*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused a copy of the above Complaint to be served on the following counsel by certified mail, return receipt requested:

Hon. Eric H. Holder
Attorney General
United States of America
United States Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530

Hon. Irvin Nathan
Attorney General
District of Columbia
Office of the Attorney General
441 4th Street, NW
Washington, D.C. 20001

Ronald C. Machen, Jr.
United States Attorney
District of Columbia
555 4th Street, NW
Washington, DC 20530

DATED: April 25, 2014

Casey M. Preston